UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Goss International Americas, Inc.,
     Plaintiff

     v.

MAN Roland, Inc. and
MAN Roland Druckmaschinen AG,
     Defendants

                                        Civil No. 03-cv-513-SM
                                        Opinion No. 2006 DNH 062

MAN Roland, Inc. and
MAN Roland Druckmaschinen AG,
     Counterclaim Plaintiffs

     v.

Goss International Americas, Inc.
and Heidelberger Druckmaschinen AG,
     Counterclaim Defendants

## O R D E R

A previous order (document no. 405) disposed of six of the fifteen pending motions for summary judgment in this case.  This order addresses four more, granting the motion presented in document no. 132, granting in part the motion presented in document no. 140, and denying the motions presented in documents nos. 130 and 139.

As a result of a previous order (document no. 101), Heidelberger remained potentially subject to liability on Counts 4, 5, and 7-11 of MAN Roland's counterclaim.  Count 5 alleges

Sherman Act violations based upon Walker Process fraud and sham litigation.  Count 4 alleges conspiracy to perform the anticompetitive acts alleged in Count 5, and Counts 7–11 are all state law claims based upon the same conduct alleged in Count 5.

Heidelberger has filed four motions for summary judgment pertaining to the remaining counts of MAN Roland's counterclaim. In document no. 130, Heidelberger moves for partial summary judgment on Counts 4, 5, and 7–11, asserting that it could not be liable under any of the theories advanced in those counts because it never sued MAN Roland for patent infringement.  In document no. 132, Heidelberger moves for partial summary judgment Count 4, pointing to the absence of evidence of an agreement in restraint of trade or a conspiracy to monopolize.  In document no. 139, Heidelberger moves for partial summary judgment on Counts 4 and 5, asserting that MAN Roland has no evidence of antitrust injury. In document no. 140, Heidelberger moves for partial summary judgment on Counts 4, 5, and 7–11, asserting that MAN Roland has no evidence of Walker Process fraud or sham litigation, which is the anticompetitive conduct underlying the Sherman Act claims in Counts 4 and 5 as well as the state law claims in Counts 7–11.

**Count 4**

In <u>document no. 132</u>, Heidelberger moves for partial summary judgment on MAN Roland's fourth counterclaim, asserting that MAN Roland has produced no evidence of an agreement in restraint of trade or a conspiracy to monopolize.  MAN Roland objects, and moves for relief under FED. R. CIV. P. 56(f) (document no. 201). Goss objects.  Heidelberger is entitled to summary judgment on Count 4 of MAN Roland's counterclaim for the reasons set out in the court's May 2, 2006, order discussing, <u>inter alia</u>, Goss's motion for partial summary judgment on Count 4 of MAN Roland's counterclaim.  Accordingly, the motion for partial summary judgment presented in document no. 132 is **<u>granted</u>**.


**Count 5**

In <u>document no. 139</u>, Heidelberger moves for partial summary judgment on MAN Roland's fifth counterclaim on grounds that MAN Roland has produced no evidence of antitrust injury.  (As drafted, document no. 139 pertained to both Counts 4 and 5, but, as explained above, Heidelberger has been granted summary judgment on Count 4 on other grounds.)


This motion for summary judgment is based, at least in part, on Heidelberger's claim that MAN Roland has failed, during

discovery, to produce adequate evidence to support its claims.[1] However, unlike evidence of the existence of a conspiracy involving Heidelberger and Goss, evidence of MAN Roland's antitrust injury is entirely within MAN Roland's control.  Thus, MAN Roland responded to Heidelberger's motion for summary judgment not by seeking relief under Rule 56(f), but, rather, by producing a fact witness to provide deposition testimony concerning its antitrust injuries.  Specifically, MAN Roland claims injuries of three sorts: (1) legal costs associated with evaluating Heidelberger's pre-litigation enforcement actions; (2) the loss of a sale due to Heidelberger's threats; and (3) the costs of defending this action.

Heidelberger responds to MAN Roland's claim for pre-litigation legal costs by arguing that MAN Roland did not adequately plead a Walker Process claim based upon pre-litigation conduct – an argument rejected below – and argues that the evidence produced by MAN Roland does not mean what MAN Roland says it means.  In particular, Heidelberger contends that MAN Roland mistakenly characterizes a letter sent by HWS's president

---

[1] To demonstrate MAN Roland's lack of evidence, Heidelberger focuses on the report and testimony of MAN Roland's economics expert, who listed four categories of potential antitrust damages, but did not identify any specific facts in the record that would support claims for damages in those four categories.

on Heidelberger letterhead as one from Heidelberger rather than
from HWS.  But that factual dispute, to the extent it actually
proves material, is not for the court to resolve on summary
judgment.  Heidelberger makes similar arguments regarding MAN
Roland's claim of a lost sale, contending that MAN Roland has
either misconstrued evidence or taken it out of context.  Again,
sorting out the relative weight of seemingly contradictory
evidence is generally a jury function, not the court's on summary
judgment.  Finally, regarding MAN Roland's claim for litigation
costs, there is at least some evidence suggesting that HWS might
have been an alter ego of Heidelberger, such that Heidelberger
could be held liable for HWS's actions.[2]  As this presents yet
another disputed question of fact that may prove material, rather
than an instance in which there is no relevant evidence at all,
summary judgment is not appropriate.  That is, because
Heidelberger's arguments depend upon the court's adopting
Heidelberger's view of a disputed factual record rather than
applying the law to an undisputed factual record, the motion for

---

[2] That evidence includes: (1) letter attempting to enforce
the '734 patent, referred to as "our patent," written by the
president of HWS on Heidelberger letterhead (MAN Roland's Obj. to
Summ. J., Ex. 5); a September 18, 2003, letter from HWS's
president, on HWS letterhead, threatening "appropriate action to
protect Heidelberg's patent interests" (id., Ex. 30).  At the
time HWS's president wrote the second letter, the patents in
question were not HWS's to enforce; Heidelberger did not assign
them until two months later.

summary judgment presented in document no. 139 is necessarily
**denied**.


### Counts 5 and 7–11

In document nos. 130 and 140, Heidelberger makes two
separate arguments for summary judgment on Counts 5 and 7–11 of
MAN Roland's counterclaim.  (As with document no. 139, document
nos. 130 and 140, as originally drafted, also cover Count 4,
which is no longer a part of the case.)  The court considers each
motion in turn.


A. Document No. 130

In document no. 130, Heidelberger asserts that it could not
be liable under any of the theories advanced in Counts 5 and 7–11
because it never sued MAN Roland for patent infringement.  In
Heidelberger's view, its November 18, 2003, assignment of the
'734 and '100 patents to Heidelberg Web Systems ("HWS"),
completed one week before HWS sued MAN Roland for infringing
those patents, precludes liability under any of the theories
advanced in Counts 5, and 7–11.  Heidelberger supports its
position, in part, by pointing out that at the time HWS sued MAN
Roland for infringement, HWS and Heidelberger were separate
corporate entities.  And, once Heidelberger assigned the '734 and

'100 patents, it no longer had standing to enforce them.  MAN Roland counters that a <u>Walker Process</u> claim may be premised upon patent enforcement activities other than filing an infringement action, and that Heidelberger is subject to liability for HWS's litigation activities, under both <u>Walker Process</u> and sham litigation theories, by means of corporate veil-piercing.

It is undisputed that Heidelberger did not sue MAN Roland, but that fact alone is not an absolute bar to MAN Roland's <u>Walker Process</u> claims.  For purposes of a <u>Walker Process</u> claim, the enforcement element may also be met by action short of filing suit, for example sending warning letters to alleged infringers. <u>See</u>, <u>e.g.</u>, <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 375 F.3d 1341, 1344-45, 1357-58 (Fed. Cir. 2004).  But Heidelberger says it is entitled to summary judgment on MAN Roland's <u>Walker Process</u> claim because the second amended answer frames the <u>Walker Process</u> claim solely in terms the patent infringement suit. Heidelberger reads the counterclaim too narrowly,[3] especially

---

[3] MAN Roland has asserted that counterclaim defendants' anticompetitive conduct includes "baselessly enforcing the fraudulently procured '734, '100, and '251 patents <u>and</u> . . . commencing a sham litigation to enforce Counterclaim-Defendants' '734, '100, and '251 patents. . ." (Second Am. Answer, ¶ 116 (emphasis added).)  That assertion is sufficient to place Heidelberger on notice that MAN Roland intends to hold it liable for both litigation to enforce the patents and other enforcement activities.

given the relatively light burden imposed by federal notice pleading.  See Brown v. Credit Suisse First Boston LLC (In re Credit Suisse First Boston Corp. Analyst Repts. Secs. Litig.), 431 F.3d 36, 46 (1st Cir. 2005) (referring to "the generous notice pleading formulation of Fed. R. Civ. P. 8(a)(2)). Heidelberger is not entitled to summary judgment on the Walker Process claims on the grounds asserted.

Summary judgment on the sham litigation claims is precluded by the apparent existence of a genuine dispute as to a material fact.  At issue is the degree to which Heidelberger is liable for the actions of its wholly owned subsidiary.  On the one hand, it is undisputed that HWS and Heidelberger were separate corporate entities, and there is some evidence that Heidelberger did not support HWS's suit against MAN Roland, because Heidelberger was in the process of selling HWS to Goss International Corp.  At the same time, however, the record includes at least some evidence of possible joint action which implies a degree of coordination that might prove inconsistent with Heidelberger's claim that HWS acted independently in the enforcement of the patents-in-suit.[4] Accordingly, at this juncture, given the relatively undeveloped

---

[4] See supra, note 2.

8

record on this point, the motion for summary judgment presented
in document no. 130 is **denied**.


B. Document No. 140

In document no. 140, Heidelberger moves for partial summary
judgment on grounds that MAN Roland has offered no evidence of
Walker Process fraud or sham litigation.


1. Walker-Process Fraud

In its second amended answer and counterclaim, MAN Roland
identifies five general categories of inequitable conduct by
Heidelberger during the prosecution of the patents-in-suit that
assertedly renders the patents-in-suit unenforceable and that
also supports MAN Roland's claims of fraud on the PTO: (1)
failure to disclose prior art and related U.S. litigation; (2)
failure to disclose foreign proceedings; (3) other misstatements
and omissions; (4) failure to disclose the best mode; and (5)
misrepresentations and omissions concerning the abandonment of
the '587 application.  Along with various general allegations
(i.e., "fail[ure] to disclose to the PTO foreign proceedings"),
MAN Roland makes the following more specific allegations of
inequitable conduct in its counterclaim: (1) failure to disclose
Canadian patent application no. 2,026,954; (2) failure to
disclose published foreign counterparts of U.S. Patent No.

9

5,316,798 ("Tittgemeyer"); (3) misrepresentation and omission of material information of record in an infringement action involving another patent based upon the same application as the patents-in-suit; (4) failure to disclose information from a European patent opposition proceeding involving European patent application no. EP 421,145 ("Gaffney"); (5) failure to disclose information from the Japanese proceeding involving Japanese Patent No. 2569,213; (6) misrepresenting the description of U.S. Patent No. 4,913,048 ("Tittgemeyer"); (7) concealing the best mode of carrying out the invention; (8) falsely stating that the '587 application was abandoned unintentionally; and (9) failing to disclose evidence that the abandonment of the '587 application was intentional.

### a. Rule 9(b)

Heidelberger contends that under Rule 9(b) of the Federal Rules of Civil Procedure, MAN Roland is limited to pursuing only those instances of fraud pled with specificity in its counterclaim, and may not pursue three additional claims first made in responses to interrogatories.  MAN Roland counters that it is entitled to use its objection to summary judgment as a de facto amendment or supplement to its counterclaim.

MAN Roland relies on <u>Bonilla v. Trebol Motors Corp.</u>, 150 F.3d 77 (1st Cir. 1998), a RICO case, in which the First Circuit was faced with a Rule 9(b) challenge to the specificity of the complaint.  The complaint in <u>Bonilla</u> alleged that the defendant Volvo automobile dealer defrauded customers by "modif[ying] or alter[ing] 240 DL models by providing some new accessories and upgraded emblems and then [selling] these 'disguised' vehicles 'as if they were factory made models' and for much more than the price that the defendants 'would have normally charged for the 240 DL Volvo models with such alterations or modifications.'" <u>Id.</u> at 81.  On summary judgment, the defendant argued that the complaint failed to meet the Rule 9(b) standard for specificity because "it did not identify any individual instance in which an individual car was sold with a false emblem and accessories added [by the defendant]."  <u>Id.</u>  Because the plaintiffs' opposition to summary judgment did describe specific instances of the fraudulent scheme alleged in the complaint, <u>id.</u>, the court of appeals decided not to remand to allow an amendment of the complaint to add that information, but rather, opted to "treat[] the plaintiffs' opposition to summary judgment . . . as a <u>de facto</u> amendment or supplement to the complaint's allegations." <u>Id.</u> (citations omitted).

11

Heidelberger, in turn, cites <u>EMC Corp. v. Storage Tech.</u> <u>Corp.</u>, 921 F. Supp. 1261 (D. Del. 1996), for the proposition that, in the specific context of a patent inequitable conduct claim, interrogatory responses may not be used to fulfill the Rule 9(b) particularity requirement.[5]  <u>Id.</u> at 1264.

While discovery responses may be used to add details to an otherwise sufficient pleading, <u>see</u> <u>EMC</u>, 921 F. Supp. at 1264 (citations omitted), they may not be used to cure deficient pleadings or to add new claims entirely.  Unlike the plaintiff in <u>Bonilla</u>, who sought simply to add specific fraudulent acts to a complaint that set out with some precision the nature of the fraudulent scheme alleged, MAN Roland seeks to add several additional categories of fraudulent conduct, separate and

---

[5] Regarding the contours of the Rule 9(b) particularity requirement, <u>EMC</u> explains:

> Pleadings that disclose the name of the relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b).  <u>See Schwarzkopf Tech.</u> <u>Corp. v. Ingersoll Cutting Tool Co.</u>, 820 F. Supp. 150, 154 (D. Del. 1992) (disclosure of prior art patent fulfills pleading requirements of 9(b)).  Rule 9(b) does not require that the complaint allege the date, time or place of the alleged inequitable conduct, provided the complaint gives the defendants notice of the precise misconduct alleged.  <u>Seville Indus.</u> <u>Machinery Corp. v. Southmost Machinery Corp.</u>, 742 F.2d 786 (3d Cir. 1984), <u>cert. denied</u>, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

921 F. Supp. at 1263.

distinct from those alleged in its counterclaim.  That is
impermissible.

Because MAN Roland is not entitled to use interrogatory
responses or its opposition to summary judgment to amend its
counterclaim, it is not entitled to pursue claims that
Heidelberger misrepresented the commercial success of its
invention,[6] failed to inform the PTO of a prior offer of sale of
a "Sunday Press,"[7] and failed to disclose arguments or briefing
papers concerning Ross '009.[8]

### b. The Allegedly Fraudulent Conduct at Issue

In its motion for summary judgment, Heidelberger argues that
it: (1) had no duty to disclose Canadian patent application no.
2,026,954; (2) did disclose the European counterpart to the
Tittgemeyer '798 patent; (3) properly disclosed the Mitsubishi
litigation and the Ross '286 patent; (4) did not breach any duty
to the PTO regarding foreign proceedings; and (5) did not breach

---

[6] Of the three claims at issue, this appears to be the only
one that MAN Roland is actively pursuing.

[7] Heidelberger's obligation to disclose that offer of sale
would appear to be contingent, at best; that offer would only be
an invalidating event if MAN Roland were successful in
challenging the 1989 priority date of the patents-in-suit.

[8] MAN Roland appears not to have pursued this claim of
inequitable conduct.

any duty to the PTO concerning the Tittgemeyer '048 patent.

Heidelberger further argues that its alleged failure to disclose

the best mode does not rise to the level of inequitable conduct.

Heidelberger does not address MAN Roland's claims regarding the

abandonment of the '587 application, presumably because MAN

Roland's amendment to its counterclaim was not allowed until

after the deadline for submitting summary judgment motions.  In

its objection to summary judgment, MAN Roland appears to abandon

several grounds for its counterclaim,[9] although that is not

entirely clear given the lack of congruity between the motion for

summary judgment and the objection.  In any event, beyond the

question of the '587 application, MAN Roland appears to engage on

four issues: (1) misrepresentation of Ross '286; (2) concealment

of information from foreign proceedings; (3) concealment of

Heidelberger's <u>Mitsubishi</u> litigation; (4) and concealment of

Walenski and JP '165.  Accordingly, those four issues comprise

the totality of MAN Roland's Sherman Act claims.

---

[9] Specifically, MAN Roland does not address Heidelberger's alleged: (1) misrepresentation of Tittgemeyer '048; and (2) failure to disclose: (a) a best mode; (b) Canadian patent application no. 2,026,954; and (c) the European counterpart to Tittgemeyer '798.

### c. The Legal Standard

Section 2 of the Sherman Antitrust Act makes it unlawful for any person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2.  See also 15 U.S.C. § 15(a) (granting a private right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws").  A successful monopolization claim under section 2 requires actual monopoly power and a wrongful act designed to enhance that power.  Town of Norwood v. N.E. Power Co., 202 F.3d 408, 420-21 (1st Cir. 2000) (citing Otter Tail Power Co. v. United States, 410 U.S. 366, 377 (1973); United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).  A successful attempted monopolization claim under section 2 requires anticompetitive conduct, a specific intent to monopolize, and a dangerous probability of success.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454-56 (1993).

Walker Process claims form a subset of section 2 claims in which the allegedly anticompetitive conduct is the enforcement of a fraudulently procured patent.  Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965).  To establish a claim for Walker Process fraud, the antitrust plaintiff must prove, inter alia, that the patentee "obtained the patent by

knowingly and willfully misrepresenting facts to the [PTO]," <u>id.</u>, and that the party enforcing the patent was aware of the fraud at the time of enforcement.  <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1069 (Fed. Cir. 1998) (citation omitted). Moreover,

> a finding of <u>Walker Process</u> fraud . . . must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, <u>i.e.</u>, that the patent would not have issued but for the misrepresentation or omission.

<u>Id.</u> at 1071.


### d. Ross '286

MAN Roland contends that Heidelberger committed fraud on the PTO by disclosing the Ross '286 patent only at the end of the '734/'100 prosecution, "buried" among a number of other references, and by misrepresenting the teaching of that patent, presumably by submitting the Federal Circuit's decision in the <u>Mitsubishi</u> case, which included a brief discussion of Ross '286.[10]  (MAN Roland also contends that Heidelberger committed fraud on the PTO by failing to disclose statements it had made

---

[10] In MAN Roland's view, Heidelberger acted with intent to defraud the PTO by submitting the opinion in the <u>Mitsubishi</u> case because the Federal Circuit's characterization of Ross '286 is, assertedly, incongruous with various characterizations of Ross '286 that Heidelberger had made to the European Patent Office.

about Ross '286 before the EPO.  That contention is addressed below, in Section g, which focuses on foreign proceedings.)

Ross '286 is a patent for a compressible roll, "especially suited as a printing roll."  '286 patent, col. 1.  Ross '286 was first disclosed to the PTO in connection with the '734/'100 prosecution in a pair of Supplemental Information Disclosure Statements ("IDSs") dated August 2, 2001.[11]  (Heidelberger's Reply Mem. (document no. 283), Exs. 2 & 3.)  Those IDSs were intended to inform the PTO of a suit involving two patents related to the pending applications "and the references cited against the patents by the defendants in that litigation."  (Id., Ex. 2 at 2; Ex. 3 at 2.)  Each IDS included a list of U.S. Patent Documents, including Ross '286.  (Id., Exs. 2 & 3.)  On each list, the patent examiner initialed the box next to listing of Ross '286, indicating that he had considered the reference. (Id.)  In addition, Heidelberger appended a copy of the Federal Circuit's decision in the case that prompted the submission of the IDSs, Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.  That decision included the following statement: "We also

---

[11] The '734 patent issued on April 23, 2002, from an application filed on November 11, 1997.  (MAN Roland's Obj. to Summ. J. (document no. 221), Ex. 1.)  The '100 patent issued on May 14, 2002, from an application filed on March 11, 1997.  (Id., Ex. 2.)

must accept Heidelberg's assertion that the Ross patent teaches
only a rigid roll with a solid core, which can be transformed
into a removable blanket only by slitting along a line parallel
to its axis and unwinding its porous filamentary layer from its
nonresilient core."  243 F. 3d 560 (unpublished table decision),
2000 WL 1375270, at *10 (Fed. Cir. Sept. 18, 2000).  While a
passage from the <u>Mitsubishi</u> decision was quoted in the narrative
portion of the IDS, the <u>Mitsubishi</u> court's discussion of Ross
'286 that MAN Roland asserts to be misleading was not quoted.

Heidelberger contends that neither the timing nor the manner
of its disclosure of Ross '286 constitute evidence of intent to
defraud the PTO.  Heidelberger is correct; no reasonable jury
could conclude, based upon the undisputed factual record, that
Heidelberger's disclosure of Ross '286 demonstrated an intent to
defraud the patent office.

MAN Roland relies upon <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d
1172 (Fed. Cir. 1995), for the proposition that a last-minute
disclosure of prior art, buried among numerous other references,
does not satisfy a patent applicant's duty of disclosure to the
PTO.  But in <u>Molins</u>, the Federal Circuit reversed, as clearly
erroneous, the district court's ruling that "by 'burying'
Wagenseil in a multitude of other references, [the applicants]

18

intentionally withheld it from the PTO because this manner of disclosure was tantamount to a failure to disclose." Id. at 1183. Here, as in Molins, the applicant submitted a list of prior art references which the examiner evidently actually considered. Id. at 1184.

Moreover, this case is distinguishable from Penn Yan Boats, Inc. v. Sea Lark Boats, Inc., 359 F. Supp. 948 (S.D. Fla. 1972), aff'd, 479 F.2d 1328 (5th Cir. 1973), in which a patent was held to be unenforceable because the attorney prosecuting it made deliberate misrepresentations to the PTO. There, the applicant submitted a list of references that were all alleged to have been uncovered during a pre-examination search, but the list included one reference – the thirteenth out of thirteen – that was a patent issued more than one year after the application at issue was filed and which, therefore, could not possibly have been discovered during a pre-examination search. Id. at 964–65. Unlike the applicant in Penn Yan Boats, who tried to "hide" a post-application reference at the bottom of a list of pre-examination references, Heidelberger did not mischaracterize Ross '286. Rather, Ross '286 is exactly what Heidelberger said it was, a reference cited by Mitsubishi against the patents on which it was sued. Finally, while Heidelberger did quote a section of the Mitsubishi decision in the narrative portion of its IDS, it

19

did not quote the discussion of Ross '286 to which MAN Roland objects and, more importantly, because the examiner had Ross '286 before him, he hardly had to rely upon the Federal Circuit's interpretation of Heidelberg's characterization of that patent from the Mitsubishi litigation.

Because Heidelberger disclosed Ross '286, and did not do so in a misleading way, no reasonable jury could conclude that Heidelberger's conduct regarding disclosure of Ross '286 evidenced an intent to deceive the PTO.  Moreover, because the patent examiner actually considered Ross '286, it cannot be said that the patents-in-suit issued as a result of Heidelberger's concealment of that reference.  See Nobelpharma, 141 F.3d at 1071 (explaining that a finding of Walker Process fraud requires "a clear showing . . . that the patent would not have issued but for the misrepresentation or omission).  Thus, Heidelberger is entitled to judgment as a matter of law that it is not liable for Walker Process fraud based upon its disclosure of '286.

### e. Mitsubishi Litigation

MAN Roland contends that Heidelberger committed fraud on the PTO by disclosing the existence of its litigation against Mitsubishi, and information from that litigation, both

incompletely and suspiciously near the end of the '734/'100 prosecution.

In 1995, Heidelberg Harris, Inc., sued Mitsubishi Heavy Industries, in the Northern District of Illinois, for infringing two patents related to the patents at issue here.  On July 22, 1998, the district court entered judgment in favor of Heidelberg Harris.  Mitsubishi appealed the judgment, and the Federal Circuit issued a decision in the case on September 18, 2000.

The application from which the '734 patent issued was filed on November 11, 1997, and the application from which the '100 patent issued was filed on March 11, 1997.  Heidelberger first disclosed the Mitsubishi litigation to the PTO by means of the two IDS forms dated August, 2, 2001.

MAN Roland argues that Heidelberger was obligated to disclose the existence of the Mitsubishi litigation much earlier than it did, given that Heidelberg Harris had sued Mitsubishi before the applications leading to the '734 and '100 patents were ever filed.  MAN Roland further argues that Heidelberger's disclosure obligation extended to: (1) a January, 1996, decision denying Heidelberg Harris's motion for a preliminary injunction, No. 95 C 0673, 1996 WL 189398 (N.D. Ill. Jan. 9, 1996); (2) a

January, 1998, decision denying Mitsubishi's summary judgment motion, No. 95 C 0673, 1998 WL 42277 (N.D. Ill. Jan. 29, 1998); and (3) trial testimony from Mitsubishi's expert witness concerning Ross '286.  Heidelberger counters that it adequately disclosed the Mitsubishi litigation by informing the PTO of its name and docket number, while the relevant applications were pending, and by submitting a copy of the Federal Circuit's decision in the case.

    MAN Roland's argument regarding the Mitsubishi litigation is somewhat hard to follow.  In its discussion of Ross '286, MAN Roland argues that Heidelberger committed fraud on the PTO by submitting the Federal Circuit opinion in Mitsubishi ("HDAG further misrepresented the teaching of Ross '286 through submission of the Federal Circuit opinion [in Mitsubishi]"), which suggests a belief that Heidelberger could have (or should have) avoided defrauding the PTO by choosing not to submit the Mitsubishi opinion.  But MAN Roland also argues that Heidelberger submitted information about the Mitsubishi litigation so late in the '734/'100 prosecution that its submission amounted to actionable non-disclosure, thus suggesting that the Mitsubishi material should have been disclosed much earlier, rather than not at all.

22

In any event, Heidelberger's disclosure of the <u>Mitsubishi</u>
litigation, which included a copy of the appellate decision and a
list of the references cited in the <u>Mitsubishi</u> defendants' 35
U.S.C. § 282 notice (<u>see</u> Heidelberger's Reply Mem., Exs. 2 & 3),
was substantially more complete than the "bare bones" disclosure
that was held to be evidence of intent to mislead the PTO in
<u>Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.</u>, 68
F. Supp. 2d 508, 550-51 (D.N.J. 1999).  Finally, even assuming
for argument's sake that Heidelberger's disclosure of the
<u>Mitsubishi</u> litigation was either untimely or insufficient, MAN
Roland has failed to demonstrate the materiality of any of the
things it claims Heidelberger failed to disclose and, as a
consequence, has no basis for arguing that the patents-in-suit
would not have issued but for the manner in which Heidelberger
disclosed the <u>Mitsubishi</u> litigation.

"[I]nformation is material to patentability when it is not
cumulative to information already of record . . . and (1) [i]t
establishes, by itself or in combination with other information,
a prima facie case of unpatentability of a claim; or (2) [i]t
refutes, or is inconsistent with, a position the applicant takes
in: (I) [o]pposing an argument of unpatentability relied on by
the Office, or (ii) [a]sserting an argument of patentability."
37 C.F.R. § 1.56(b).  Moreover, in the context of a <u>Walker</u>

Process fraud claim, liability for a failure to disclose ensues only if the patent in question would not have issued but for the omission.  See Nobelpharma, 141 F.3d at 1071.

The closest MAN Roland comes to making an argument for materiality is its suggestion that Heidelberger's manner of disclosure facilitated its misrepresentations of the basis for the commercial success of the Sunday Press, but, as explained above, MAN Roland's counterclaim fails to plead a fraud claim based upon a misrepresentation of commercial success in a manner that comports with Rule 9(b).  Beyond its argument concerning commercial success, MAN Roland simply does not indicate any way in which any of the allegedly suppressed information (i.e., pre-judgment district court decisions in Mitsubishi and trial testimony), meets the definition of materiality set out in 37 C.F.R. § 1.56(b).[12]

Because MAN Roland has articulated no theory of materiality for the material it charges Heidelberger with fraudulently concealing and, as a consequence, has failed to demonstrate that

---

[12] Because Heidelberger has identified no material information from the Mitsubishi litigation, the timing of Heidelberger's disclosure of that litigation is irrelevant; Heidelberger was under no duty to make timely disclosure of non-material information.

the patents-in-suit would not have issued but for Heidelberger's
conduct, Heidelberger is entitled to judgment as a matter of law
that it is not liable for <u>Walker Process</u> fraud based upon its
disclosure of the <u>Mitsubishi</u> litigation.

### f. JP '165 and Walenski

MAN Roland contends that Heidelberger committed fraud on the
PTO by concealing JP '165 and Walenski during the '734/'100
prosecution.  Heidelberger concedes that it did not disclose
either reference, but contends that it had no duty to do so
because both references were cumulative to other references
already of record.

### 1. JP '165

"JP '165" is "Japanese Unexamined Utility Model Application
Publication S63-30165," published on February 27, 1988.  (MAN
Roland's Obj. to Summ. J., Ex. 6.)  Heidelberger became aware of
JP '165 in early 1997 when it was cited in an objection to
Heidelberger's Japanese Patent No. 2-569213 ("JP '213"), which
issued from a counterpart to Heidelberger's U.S. '587
application.  In response to the objection, and based in part on
JP '165, the Japanese Patent Office cancelled fifteen claims in
Heidelberger's JP '213 patent.  (<u>Id.</u>, Ex. 63.)

25

MAN Roland contends that Heidelberger was obligated to disclose JP '165 because "JP '165 – and, in particular, Figure 3 – teaches a tubular printing blanket with an intermediate compressible layer."  MAN Roland's position appears to be based upon a belief that JP '165 is prior art which establishes the prima facie unpatentability of the inventions claimed in the patents–in–suit, presumably on the basis of obviousness.

However, no reasonable jury could conclude, from the evidence produced by MAN Roland, that JP '165 teaches a tubular printing blanket.  Neither the word "tubular" nor the word "sleeve," nor any synonym of those terms, appears anywhere in JP '165.  And while that patent describes the layers of a printing blanket, it is absolutely silent regarding printing blanket form, i.e., flat versus tubular.

JP '165 includes five figures, three depicting the invention, two depicting the conventional printing blankets over which the '165 invention was an improvement.  (Id., Ex. 6.)  Two of the figures showing the invention depict a flat blanket.

MAN Roland charges Heidelberger with concealing Figure 3, which depicts the claimed printing blanket installed on a blanket cylinder which is engaged, at the "nip," with a plate cylinder.

Because the blanket cylinder is round, the blanket installed on
it also appears to be round.  Based upon the specification of JP
'165, is clear that Figure 3 was included not to teach a tubular
printing blanket – which teaching is nowhere supported by the
specification – but to depict the increase in nip width afforded
by the invention, which is the means by which it achieves its
advantage over traditional printing blankets with other kinds of
layers which produce narrower nips.  Moreover, while MAN Roland
asserts, in its brief, that its expert testified that Figure 3
"illustrates a tubular configuration . . . that a person of
ordinary skill in the art would recognize," that expert actually
testified that "the JP '165 is also unique in having a diagram
which certainly strongly suggests a sleeve."  (Id., Ex. 79 at
266.)  A patent with a diagram suggesting a sleeve is hardly one
that teaches a tubular printing blanket.

     Because JP '165 does not teach a tubular printing blanket,
its disclosure would not have compelled a conclusion that the
inventions claimed in the patents–in–suit were unpatentable.
Thus, JP '165 was not material, and not required to be disclosed.
Accordingly, Heidelberger is entitled to judgment as a matter of
law that it is not liable for Walker Process fraud for failing to
disclose JP '165.

2. Walenski

"Walenski" is a 1971 book titled <u>Introduction to Offset</u>
<u>Printing</u>.  (MAN Roland's Obj. to Summ. J., Exs. 5 & 61.)  On
August 31, 1994, MAN Roland cited Walenski in its opposition to
Heidelberger's EP '145.[13]  (<u>Id.</u>, Ex. 55.)  Subsequently, the EPO
revoked EP '145, and cited Walenski in its decision, issued in
early 1996.  (<u>Id.</u>, Ex. 56.)  Later in 1996, Heidelberger itself
made various representations to the EPO concerning the
materiality of Walenski.  (<u>See</u>, <u>e.g.</u>, <u>id.</u>, Ex. 59.)  However,
during the '734/'100 prosecution, Heidelberger first disclosed
Walenski to the PTO in its August 2, 2001 IDS, when it
transmitted copies of the references listed in its modified Form
1449, "(with the exception of . . . Walenski, "Introduction to
Offset Printing" (1971)), copies of which have not been found as
of this date."  While Heidelberger listed Walenski on the
modified Form 1449 it submitted, the examiner drew a line through
the reference, indicating that he did not consider it.

MAN Roland contends that Heidelberger committed fraud on the
PTO by disclosing Walenski late in the prosecution, by failing to
explain the reference (as required by 37 C.F.R. § 1.98(a)(3), by
failing to provide a copy of it, and by falsely stating that it

---

[13] Additionally, in the <u>Mitsubishi</u> litigation, Mitsubishi
listed Walenski in its § 282 prior art notice.

was unable to obtain a copy.  (MAN Roland also charges
Heidelberger with fraud for failing to disclose an EPO decision
concerning Walenski as well as its own representations to the EPO
about Walenski.  Those contentions are addressed below, in
Section g, which focuses on foreign proceedings.)  As noted,
Heidelberger argues that it had no duty to disclose Walenski
because it was a cumulative reference.

MAN Roland counters that a jury could conclude that Walenski
was not cumulative, and thus material, based upon: (1) the
discussion of Walenski in an EPO decision; (2) Heidelberger's
statements to the EPO regarding Walenski; (3) the fact that
Walenski was a textbook; (4) an alleged admission by the head of
Heidelbergar's patent department that EP '145 should have been
disclosed to the PTO; and (5) Heidelberger's alleged
misrepresentation to the PTO that it was unable to locate a copy
of Walenski.

What is missing from MAN Roland's argument is any indication
of how Walenski itself – as opposed to various characterizations
of Walenski – "establishes, by itself or in combination with
other information, a prima facie case of unpatentability."  37
C.F.R. § 1.56.  In other words, while MAN Roland has identified
some circumstantial evidence of Heidelberger's knowledge of the

potential importance of Walenski in other contexts, it has failed

to meet Heidelberger's motion for summary judgment with an

adequate proffer of the materiality of Walenski.  Unless Walenski

was material in <u>this</u> context, Heidelberger was under no

obligation to disclose it.  As with JP '165, MAN Roland's failure

to explain why the patents-in-suit would not have issued but for

the non-disclosure of Walenski dooms its claim.  Heidelberger is

entitled to judgment as a matter of law that it is not liable for

<u>Walker Process</u> fraud for failing to disclose Walenski.


### g. Foreign Proceedings

MAN Roland contends that Heidelberger committed fraud on the

PTO by failing to disclose: (1) the existence of three foreign

proceedings involving EP '740, EP '145, and JP '213; (2) EPO and

JPO decisions that included discussions of the teachings of

Walenski and JP '165; (3) its admission to the EPO, in defense of

its European '145 patent, that Walenski was the closest prior art

for an intermediate compressible layer in a tubular blanket; and

(4) its admission to the EPO, in an opposition to MAN Roland's

European '740 patent, that Ross '286 teaches a compressible,

tubular blanket, as well as a similar admission to the EPO, in

defense of its own European '145 patent.

EP '145 and JP '213 are foreign patents, issued to
Heidelberger, that were revoked in full or in part, and EP '740
is a foreign patent that was issued to MAN Roland and challenged
by Heidelberger before the EPO.  In the course of defending its
own patents, or attacking MAN Roland's patents, Heidelberger made
various arguments concerning the teachings of Ross '286, JP '165,
and Walenski and, in response, the EPO and the JPO issued
decisions that discussed those three references.

"The details of foreign prosecution[s] are not an additional
category of material information [that must be disclosed to the
PTO]."  ATD Corp. v. Lydall, Inc., 159 F.3d 534, 547 (Fed. Cir.
1998) (citing Molins, 48 F.3d 1180) (holding that where prior art
reference was of record in U.S. patent application, applicant was
under no obligation to submit foreign search report and
prosecution records applying that reference to foreign
counterpart application).  Rather, "it is the [prior art]
reference itself, not the information generated in prosecuting
foreign counterparts, that is material to prosecution in the
United States."  Id.

MAN Roland has identified no viable legal theory under which
Heidelberger was obligated to disclose either the existence of
foreign patent office proceedings or the arguments it made during

those proceedings.  That is not surprising, as the Federal Circuit has often noted "the fact that the theories and laws of patentability vary from country to country, as do examination practices . . . [and that] international uniformity in theory and practice has not been achieved."  <u>Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.,</u> 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994).

Moreover, while the definition of materiality refers to "information . . . [that] refutes , or is inconsistent with a position the applicant takes," 37 C.F.R. § 1.56(b) (emphasis added), the kind of "information" the regulation refers to is prior art or other factual information, not previous arguments for or against patentability in other fora.  <u>See</u> <u>ATD</u>, 159 F.3d at 547.  According to a section of the Manual of Patent Examining Procedure ("MPEP") titled "Prior Art Cited in Related Foreign Applications":

> Applicants . . . have a duty to bring to the attention of the [Patent] Office any material prior art or other information cited or brought to their attention in any related foreign application.  The inference that such prior art or other information is material is especially strong ** where it has been used in rejecting the same or similar claims in the foreign application.

MPEP 2001.06(a).  Because the arguments Heidelberger made to foreign patent offices do not qualify as information cited or brought to Heidelberger's attention, Heidelberger had no duty to disclose those arguments.

MAN Roland places considerable emphasis on its allegation that Heidelberger made arguments concerning the teachings of various prior art references to the PTO that contradicted arguments it had made to one or more foreign patent offices, and contends that Heidelberger was obligated to disclose the arguments it made to those foreign offices.  Failure to disclose arguments made to foreign patent offices might support a partial defense to infringement based upon "unclean hands."  See Rixon, Inc. v. Racal-Milgo, Inc., 551 F. Supp. 163, 179 (D. Del. 1982) ("Having taken the position it did in the German patent office proceeding, Milgo, at least in the absence of disclosure of that fact, was precluded from urging upon the Kansas Court an inconsistent infringement theory.")  But in Rixon, the alleged infringer's successful invocation of an unclean hands defense did not even support a determination of unenforceability – much less antitrust liability.  Rather, the court merely barred the applicant from relying on any theory of infringement contrary to a position taken in a foreign patent office proceeding. Moreover, Rixon is distinguishable, and the applicant's actions

33

substantially more egregious, because there the applicant's inconsistent statements concerned the definition of its invention, not its interpretation of the teachings of prior art references.[14]

Foreign patent office decisions stand on a somewhat different footing from the categories of information discussed above, but on the facts of this case, Heidelberger had no duty to disclose the decisions at issue.

As a preliminary matter, and as noted above, "[c]ourts should be 'mindful of the risk in relying on foreign patent prosecution in light of differences in disclosure requirements, claim practice, form of application, and standard of patentability.'"   Inverness Med. Switz. GmbH v. Acon Labs., Inc.,

---

[14] In Molins, the court was presented with evidence about what a patent applicant had said about a prior art reference, Wagenseil, during the course of several foreign prosecutions.  48 F.3d at 1180-81.  But the question in that case was not whether the applicant had a duty to disclose to the PTO what he had said about Wagenseil in foreign proceedings.  Rather, the question was whether the applicant's failure to disclose Wagenseil to the PTO was inequitable conduct, and his statements about Wagenseil to foreign examiners was used to support the court's holding that the reference was material and that the applicant had withheld it with the requisite degree of intent to deceive the PTO.  In other words, Molins does not stand for the proposition that an applicant's interpretive statements to foreign patent offices about prior art references fall within a category of information that must be disclosed to the PTO.

323 F. Supp. 2d 227, 248 (quoting Molins, 48 F.3d at 1180).  In
addition, "it is the [prior art] reference itself, not the
information generated in prosecuting foreign counterparts, that
is material to prosecution in the United States." ATD, 159 F.3d
at 547 (Fed. Cir. 1998).  Here, MAN Roland contends that
Heidelberger was obligated to disclose several foreign patent
office decisions because of their discussions of JP '165 and
Walenski.  But because MAN Roland has failed to explain how those
references are material, as discussed above, foreign decisions
interpreting those references must, necessarily, be immaterial.

     Moreover, this case is easily distinguishable from
Inverness, the case MAN Roland cites for the proposition that a
foreign patent office decision can be material to a U.S.
prosecution.[15]  At issue in that case was the materiality of a
foreign patent office decision revoking a European counterpart
based upon a combination of four prior art references.  323 F.
Supp. 2d at 249.  In ruling on a request for a preliminary
injunction, the court held that the patent challenger was likely

_____

     [15] In addition to ruling, on the facts of the case before
her, that a foreign patent office decision could be material,
Judge Saris also noted "the lack of clear caselaw requiring an
applicant to disclose an adverse decision by a foreign patent
examiner and the basis for it," and held that the patent
challenger in that case had failed to "demonstrate[] an ability
to prove the requisite intent [to defraud the PTO] by clear and
convincing evidence."  323 F. Supp. 2d at 249.

to succeed on its materiality argument based, in part, on "a prior request by the patent examiner for information regarding European patents in light of the over 200 prior art references made in the '982 patent."  Id.  Here, by contrast, Heidelberger did not deluge the examiner with prior art references, and the examiner made no request for assistance.  Accordingly, the result in Inverness is not applicable to this case.

Because Heidelberger had no duty to disclose any information from the foreign proceedings identified by MAN Roland, Heidelberger is entitled to judgment as a matter of law that it is not liable for Walker Process fraud for failing to do so.

### 2. Sham Litigation

Sham litigation claims form another subset of section 2 claims in which the allegedly anticompetitive conduct is the enforcement of a patent through litigation, with knowledge that the patent is invalid or not infringed.  C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1368 (Fed. Cir. 1998).  To establish a claim for sham litigation, the antitrust plaintiff must prove, inter alia, that the challenged lawsuit is objectively baseless and subjectively motivated "to interfere directly with the business relationships of a competitor."  Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60–61

(1993) (quoting E. R.R. Presidents Conf. v. Noerr Motor Freight,
Inc., 365 U.S. 127, 144 (1961)) (emphasis added by PRE).  A
lawsuit is objectively baseless if "no reasonable litigant could
realistically expect success on the merits."  PRE, 508 U.S. at
60.  A patent infringement suit is objectively baseless when the
infringement plaintiff knows that the patent is invalid or not
infringed.  See C.R. Bard, 157 F.3d at 1368.

In its counterclaim, MAN Roland asserts that when the
counterclaim defendants commenced litigation they "knew and/or
should have known that the patents in issue were invalid and/or
unenforceable in view of prior art, failures to comply with the
requirements of 35 U.S.C. § 112, double patenting, and
inequitable conduct and were not infringed by Counterclaim–
Plaintiffs."  Heidelberger's argument for summary judgment on MAN
Roland's sham litigation claims consists of a single point made
in one paragraph: that MAN Roland has not presented evidence that
it brought this action with knowledge that the patents–in–suit
were unenforceable, invalid, and/or not infringed.  In its
objection to summary judgment, MAN Roland appears not to address
its sham litigation claim, concentrating, instead, on its Walker
Process claim.  It seems that MAN Roland may be letting its sham
litigation claim fade away, but on the record as developed and

the arguments presented, Heidelberger is not entitled to summary judgment on that part of Count 5.

### 3. What Remains

Because of the volume of the pleadings in this case, the existence of multiple motions addressing the same count of the counterclaim,[16] the interrelationships between various theories,[17] the fact that the same conduct serves as the basis for multiple legal claims,[18] and the lack of congruity among the pleadings,[19]

---

[16] In this order alone, the court has been faced with three different summary judgment motions pertaining to Count 5 of the counterclaim.

[17] For example, the grounds for invalidity stated in Count 2 of the counterclaim might support the sham litigation claim stated in Count 5.

[18] For example, various actions and inactions during the prosecution of the patents-in-suit have been asserted as the basis for: (1) an affirmative defense of unenforceability for inequitable conduct; (2) a declaratory judgment of unenforceability for inequitable conduct (Count 3 of the counterclaim); and (3) a claim of Walker Process fraud (Count 5 of the counterclaim).

[19] For example, the motion for summary judgment presented in Heidelberger's document no. 140 addresses the full range of grounds set forth in MAN Roland's Walker Process claim, while MAN Roland's response, document no. 221, discusses only a subset of those grounds.  On the other hand, some of those grounds, such as failure to disclose a Canadian patent application, would appear to be eliminated, based upon the granting of the motion for partial summary judgment presented in document no. 153, concerning the effective filing date of that application.

it is not easy to keep track of which parts of this case are
still alive and which parts have been eliminated.  But here goes.

As a result of this order, Count 4 of the counterclaim is
out, as to Heidelberger.

The <u>Walker Process</u> portion of Count 5 remains, in part, but
<u>only</u> to the extent it is based upon allegations of fraud during
the prosecution of the '587 application;[20] Heidelberger is
entitled to judgment that it is not liable for <u>Walker Process</u>
fraud based upon its conduct regarding Ross '286, the Mitsubishi
litigation, JP '165, Walenski, and proceedings involving EP '740,
EP '145, and JP '213.  Because allegations concerning the '587
application came into the case after the deadline for summary
judgment motions, Heidelberger may file a concise summary

_____

[20] The court further notes the rather anomalous status of
MAN Roland's contentions regarding the prosecution of the '587
application.  In MAN Roland's counterclaim, Heidelberger's
alleged misrepresentations to the PTO concerning the '587
application appear to be one of the grounds for a <u>Walker Process</u>
claim, but in MAN Roland's objection to summary judgment
(document no. 221), Heidelberger's conduct concerning the '587
application is not raised as an independently actionable instance
of fraud or inequitable conduct but, rather, as evidence of
Heidelberger's intent to deceive the Patent Office.  It is
difficult to imagine how so much confusion can remain after so
many words have been spilled on so many pages, unless obfuscation
itself has become both a tactic and an objective.  Simplicity,
clarity of presentation, and candor, probably require just as
much time (likely more) as obfuscation, and no doubt would prove
more effective and as remunerative.

judgment motion limited to MAN Roland's claim of <u>Walker Process</u> arising out of the prosecution of the '587 application, if, indeed, MAN Roland is making such a claim.

The sham litigation portion of Count 5 also remains but, as noted above, appears to be hanging by the proverbial thread.

### Conclusion

For the reasons given, the motion for summary judgment presented in document no. 132 is granted; the motion for summary judgment presented in document no. 140 is granted in part, and the motions for summary judgment presented in document nos. 130 and 139 are denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 2, 2006

```
cc:  Daniel E. Will, Esq.
     Hugh T. Lee, Esq.
     Richard S. Gresalfi, Esq.
     Georg C. Reitboeck, Esq.
     Mark A. Hannemann, Esq.
     Michael J. Lennon, Esq.
     T. Cy Walker, Esq.
     Danielle L. Pacik, Esq.
     Jonathan M. Shirley, Esq.
     Alfred H. Hemingway, Jr., Esq.
     Irvin D. Gordon, Esq.
     Martin B. Pavane, Esq.
     Michael J. Songer, Esq.
     Shari R. Lahlou, Esq.
     Sidney R. Bresnick, Esq.
     Teodor J. Holmberg, Esq.
     Richard D. Margiano, Esq.
     John F. Sweeney, Esq.
     Steven F. Meyer, Esq.
     Tony V. Pezzano, Esq.
     Bruce W. Felmly, Esq.
     Seth J. Atlas, Esq.
     Anthony S. Augeri, Esq.
```