UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Goss International Americas, Inc.,
     Plaintiff

     v.

MAN Roland, Inc. and
MAN Roland Druckmaschinen AG,
     Defendants
                                        Civil No. 03-cv-513-SM
                                        Opinion No. 2006 DNH 088

MAN Roland, Inc. and
MAN Roland Druckmaschinen AG,
     Counterclaim Plaintiffs

     v.

Goss International Americas, Inc.
and Heidelberger Druckmaschinen AG,
     Counterclaim Defendants

## <u>O R D E R</u>

In document no. 150, Goss moves for summary judgment on each of its three claims of patent infringement against MAN Roland. More specifically, Goss argues that MAN Roland's Rotoman S offset lithographic press, which includes printing blankets produced by Reeves and MacDermid, infringes claim 1 of U.S. Patent No. 6,386,100 (the '100 patent), claim 1 of U.S. Patent No. 6,739,251 (the '251 patent), and claim 1 of U.S. Patent No. 6,374,734 (the '734 patent).  MAN Roland objects.

## The Legal Standard

Resolution of the pending motion is governed by the following legal principles:

> Determining patent infringement is a two step process: "the court first construes the scope of the asserted claims and then compares the accused device to the properly construed claims to determine whether each and every limitation of the claim is present, either literally or equivalently, in the accused device." Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1365 (Fed. Cir. 2002) (citing Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001)). Claim interpretation is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 977 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). But, whether the accused product infringes the claims as interpreted is a factual question. Syntex (U.S.A.) LLC v. Apotex, Inc., 407 F.3d 1371, 1377 [(Fed. Cir. 2005)] (citing Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998)). Because infringement is based on a question of fact, summary judgment on infringement is proper for the patent owner only when, drawing all inferences in favor of the alleged infringer, there exists no genuine issue of material fact that every limitation recited in the properly construed claim is found in the accused product. P.C. Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005) (citing Bai, 160 F.3d at 1353-54).

Mangosoft, Inc. v. Oracle Corp., 421 F. Supp. 2d 392, 396 (D.N.H. 2006) (parallel citations omitted).

## Relevant Claims of the Patents-in-Suit

The '100 patent is for an offset lithographic printing press.  Claim 1, the single claim in the '100 patent, recites:

An offset lithographic printing press comprising:

a)   a first and second sidewall for carrying print
     cylinders;

b)   a plate cylinder;

c)   a printing plate;

d)   a blanket cylinder engageable with the plate
     cylinder, the blanket cylinder having passages
     extending to an outer surface of the blanket
     cylinder;

e)   a removable printing blanket mounted axially over
     the blanket cylinder, the printing blanket being
     tubular in shape and having an outer first
     circumferential surface;

f)   a source of pressurized fluid coupled to the
     blanket cylinder, the source of fluid applying
     fluid to the blanket cylinder and through the
     plurality of passages to expand the removable
     printing blanket during installation and removal
     of the removable printing blanket;

g)   one sidewall including a portion movable between a
     supporting position in axial alignment with the
     blanket cylinder and an open position spaced from
     the blanket cylinder to provide an opening in said
     sidewall to enable the printing blanket to be
     slideably removed from the outer surface of the
     blanket cylinder when the portion of the sidewall
     is in the open position;

h)   the removable printing blanket further comprising
     an outer printing layer for transferring ink from
     the printing plate; a gapless rigid, cylindrical
     inner layer; and an intermediate, compressible
     layer.

'100 patent, col. 12, ll. 27-54.

3

The '251 patent is also for an offset lithographic printing press.  Claim 1, the first of eight claims in the '251 patent, recites:

An offset lithographic printing press comprising:

a)   a first and second sidewall;

b)   a plate cylinder;

c)   a printing plate adapted to be wrapped around the surface of the plate cylinder, the printing plate having opposite ends;

d)   a blanket cylinder having passages extending to an outer surface of the blanket cylinder;

e)   a removable printing blanket mounted axially over the blanket cylinder, the printing blanket being tubular in shape;

f)   a source of pressurized fluid coupled to the blanket cylinder, the source of fluid applying fluid to the blanket cylinder and through the passages to expand the removable printing blanket during installation and removal of the removable printing blanket;

g)   said first sidewall having a moveable portion to provide an opening in the first sidewall to enable the printing blanket to be slideably removed from the blanket cylinder when the portion of [the] said [] first sidewall is in the open position; and

h)   the removable printing blanket comprising a rigid cylindrical inner layer; an outer printing layer for transferring an ink pattern to a web; and an intermediate compressible layer between said inner and outer layers; wherein the removable printing blanket has an outer circumferential surface and is radially expandable so as to enable the blanket to be axially mounted onto the blanket cylinder of the offset printing press.

4

'251 patent, col. 12, l. 40 – col. 13, l. 3.

The '734 patent is for a tubular printing blanket.  Claim 1, the first of twelve claims in the '734 patent, recites:

> A tubular printing blanket for use on a blanket cylinder in an offset printing press comprising:
>
> a rigid cylindrical inner layer;
>
> an outer printing layer for transferring an ink pattern to a web; and
>
> an intermediate compressible layer between said inner and outer layers, the tubular printing blanket being radially expandable so as to enable the blanket to be axially mounted onto the blanket cylinder of the offset printing press.

'734 patent, col. 12, ll. 28–38.

## The Accused Devices

As explained more fully below, MAN Roland's defense to Goss's infringement claims rests on its contention that certain claim limitations ("outer printing layer" and "intermediate compressible layer") are not present in its Reeves and MacDermid printing blankets.  Thus, it is necessary to generally describe the accused blankets.  The Reeves blanket is manufactured by: (1) wrapping a flat printing blanket, with two or more layers, around

5

a nickel sleeve; (2) adhering the blanket to the sleeve; (3) filling the space between the abutting ends of the blanket; and (4) vulcanizing the blanket.  The MacDermid blanket is manufactured by: (1) wrapping a compressible layer twice around a nickel sleeve; and (2) applying an outer printing layer over the intermediate compressible layer.

## Discussion

Goss argues that all of the limitations recited in each of the three claims quoted above is present in the accused device, MAN Roland's Rotoman S press (including a Reeves or MacDermid printing blanket).  MAN Roland counters that its Rotoman S press does not literally infringe the patents-in-suit because: (1) the patents-in-suit claim a gapless, seamless, and continuous outer printing layer which the Reeves blanket does not have, due to the filled space between the ends of the layers wrapped around the nickel sleeve; and (2) the patents-in-suit claim an intermediate layer that is gapless and equally compressible, which neither of the accused blankets has, due to the filled space between the ends of the layers in the Reeves blanket and the overlapping of the intermediate layer in the MacDermid blanket.

MAN Roland also argues that because the accused blankets have a gap, or discontinuity, they operate differently from the

6

claimed printing blankets and achieve different results, which renders them non-infringing under the doctrine of equivalents. Finally, MAN Roland argues that during prosecution of the patents-in-suit, the applicants disavowed a broader claim scope (gapped, discontinuous, and/or unequally compressible printing blankets), which now estops Goss from reclaiming that scope by invoking the doctrine of equivalents.

Because MAN Roland discusses only the "outer printing layer" and the "intermediate compressible layer" in its objection to Goss's motion for summary judgment, MAN Roland apparently concedes that all the other limitations of the relevant claims are present in the Rotoman S press and its Reeves and MacDermid printing blankets.  Moreover, MAN Roland does not argue that the Reeves blanket lacks an outer layer that transfers ink from a printing plate to a web or that both blankets lack a compressible layer disposed between their inner and outer layers.  Rather, MAN Roland contends that the outer printing layer of the Reeves blanket and the intermediate compressible layers of both blankets are materially different from the layers claimed in the patents-in-suit, because the outer printing layer of the Reeves blanket has gaps, discontinuities, or seams, and because the intermediate compressible layers of both blankets have both gaps and unequal compressibility.  Thus, the issue before the court is one of

claim construction, specifically, whether the claims, properly construed, extend only to printing blankets with gapless, continuous, and seamless outer printing layers, and equally compressible gapless intermediate compressible layers.

A. Outer Printing Layer

In a previous order (document no. 403), the court construed the "outer printing layer" claim to include a "gapless" limitation, but not a "seamless" limitation, and further explained that a printing blanket gap, as defined by reference to the specification, can exist only when a printing blanket is attached to a blanket cylinder by means of a clamping gap in the cylinder.  Because the Reeves blanket is not attached to the Rotoman S blanket cylinder by means of a clamping gap, the blanket and all of its layers are gapless within the meaning of the claim terms.  Because there is no "seamless" limitation, all that remains to be determined is whether the "outer printing layer" term is subject to a "continuous" limitation and, if it is, whether the Reeves blanket meets that claim term.

Goss does not concede that its claims contain a "continuous" limitation – pointing out that it actually removed the word "continuous" from the "outer printing layer" claim during prosecution – but argues that even with that claim limitation,

8

the Reeves blanket still infringes, because its outer printing layer is continuous, or is the equivalent of a continuous outer printing layer.

The term "continuous" is not to be found in the claims themselves, which militates against imposing that limitation. See Phillips v. AWH Corp., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). In the words of the Supreme Court, "if we once begin to include elements not mentioned in the claim, in order to limit such claim, . . . we should never know where to stop." McCarty v. Lehigh Valley R.R. Co., 160 U.S. 110, 116 (1895).

On the other hand, the common specification of the patents-in-suit contains some language that appears to support a construction of the term "outer printing layer" to include a "continuous" limitation on the outer surface of the outer printing layer. See Phillips, 415 F.3d at 1315 ("claims 'must be read in view of the specification, of which they are a part'") (quoting Markman, 52 F.3d at 979). Under the heading "Objects and Summary of the Invention," the specification explains that "[t]he present invention provides an offset lithographic printing press, comprising: . . . a removable printing blanket mounted on the blanket cylinder, the printing blanket being tubular in shape and having a continuous outer circumferential gap–free surface."

'734 patent, col. 3, ll. 26-32 (emphasis supplied).  The detailed
description further provides:

> [T]he printing blanket has a cylindrical outer surface
> which is continuous and free of gaps to promote smooth
> rolling engagement with the cylindrical outer surface
> of the printing plate on the plate cylinder.  The
> absence of gaps in the smooth cylindrical outer surface
> of the printing blanket eliminates bumps or vibrations
> as compared to having a gap which rolls into and out of
> engagement with the surface of the printing plate on
> the plate cylinder.  The elimination of bumps or
> vibrations tends to minimize smearing of the ink
> pattern as it is applied to the surface of the printing
> blanket by the printing plate on the plate cylinder.
>      By providing the printing blanket with a
> cylindrical outer surface which is continuous and free
> of gaps, the diameter of the printing blanket and the
> diameter of the blanket cylinder can be minimized.
> Thus, an ink pattern can be applied to the surface of
> the printing blanket throughout the entire area of the
> surface.  The ink pattern can extend across an area
> where a gap was previously formed in the surface of
> known blanket cylinders.
>      In addition, by providing the printing blanket
> with a cylindrical outer surface which is continuous
> and free of gaps, the amount of the web which is wasted
> during a printing operation is reduced.

'734 patent, col. 5, l. 54 – col. 6, l. 11 (references to the
drawing omitted).

    While the outer surface of the printing blanket is described
in the common specification as "smooth" and/or "continuous," the
argument for imposing a "continuous" limitation is not nearly as
strong as the argument for imposing a "gapless" limitation.  The
patents-in-suit all describe the field of the invention as

10

"gapless tubular printing blankets," and they describe in great detail the benefits associated with using gapless printing blankets, as opposed to conventional gapped printing blankets. But, that section of the specification devoted to the field of the invention says nothing about the continuous nature of the outer surface of the outer printing layer.  And, notwithstanding MAN Roland's arguments to the contrary, the specification touts the benefits of a continuous outer surface only ambiguously, at best, and certainly does not do so by contrasting the performance of a continuous outer surface with that of a non-continuous outer surface.  Finally, the specification does not provide any guidance regarding how to identify or measure the physical characteristics that would make a printing surface continuous or smooth.  Because the claims themselves do not include the term "continuous," and because the specification uses but does not adequately define that term, there is no basis in the patents-in-suit for taking the extraordinary step of reading an ambiguous "continuous" limitation into the relevant claims.

The prosecution history is equally unavailing to MAN Roland's desired claim construction.  In MAN Roland's view, the claims must contain a "continuous" limitation because the applicants, in attempting to overcome various PTO objections, distinguished their invention from prior art printing blankets

with discontinuities.  In particular, MAN Roland points to the applicants' discussions of Brands '550 and Ross '023.  However, the applicants did not impose a "continuous" limitation on their claims by distinguishing those prior art references.

Brands '550 is a patent for a gap filler blanket for a printing cylinder.  The invention in that patent is a device for filling in the gap created when a printing blanket is installed on a gapped blanket cylinder.  Thus, by distinguishing Brands, the applicants plainly imposed a "gapless" limitation on their claims, but did not impose a "continuous" limitation because the only discontinuity addressed by the invention in Brands is that created by a printing blanket gap.

Ross '023 is a patent for a process for producing reinforced laminate.  The printing blankets described in that patent are wash blankets used for printing textiles.  '023 patent, col. 1, ll. 37–44.  As Ross explains, "[i]n many printing ranges, the blanket is used as the power transmitting means . . . as well as acting as an impression and color receiving blanket."  '023 patent, col. 1, ll. 58–61.  Ross teaches the use of a continuous strand of yarn, wrapped helically, to form part of the intermediate layer of a wash blanket.  '023 patent, col. 6, ll. 1–9.

Ross was cited by the examiner in an August 10, 1992, office action objecting to and rejecting various claims of the '668 application, one of the ancestor applications of the patents-in-suit.  (MAN Roland's Obj. to Summ. J., Ex. 25.)  Specifically, the examiner stated that "it would have been obvious to helically wind the compressible layer or any layer in the sleeve of Tittgemeyer to create a continuous layer with no seams or gaps."  (MAN Roland's Obj. to Summ. J., Ex. 25 at 5.)  The August 10, 1992, office action contains several similar comments.  The applicants responded:

> The prior art references do not disclose or suggest a gapless and seamless cylindrical compressible layer including a circumferentially endless tubular body of elastomeric material.  The prior art references therefore cannot disclose or suggest a compressible thread extending helically through a circumferentially endless tubular body of elastomeric material . . . .  Regarding Ross, the function of the reinforcing cords 14 is to strengthen the structure <u>across the splice</u>.  There is no reason why one skilled in the art would find it obvious to use such helical cords in a structure that <u>does not have a splice</u> and where reinforcing of a splice is unnecessary and irrelevant.

(MAN Roland's Obj. to Summ. J., Ex. 12 at 8 (emphasis in the original).)

By distinguishing Ross, the applicants did not impose a "continuous" limitation on the outer surface of the outer printing layer claimed in the patents-in-suit.  In Ross, the

13

principal problem addressed by the invention was how to provide
uniform strength in a belt-like fabric blanket that had to be
joined together, or spliced, to form a continuous loop.  '023
patent, col. 1, l. 63 – col. 2, l. 6.  By contrast, the printing
blanket in the patents-in-suit – which does not provide power
transmission – is not a structure formed by splicing together the
opposite ends of a flat object.  A structural splice is all that
the applicants disclaimed by distinguishing Ross.  But because a
structural splice is not the only possible source of
discontinuity in a printing blanket, it does not follow from the
applicants' disavowal of a structural splice that they were
limiting their claims to a continuous outer surface of the outer
printing layer.

    Finally, the prosecution history of the patents-in-suit
actually seems to contradict MAN Roland's contention that a
discontinuous outer surface is created when the outer layers of a
printing blanket are wrapped around the inner layer.  The
patents-in-suit are all descendants of the October 5, 1989, '587
application.  The '587 application is also listed as an ancestor
to U.S. Patent No. 5,553,541 (the '541 patent), which claims a
gapless tubular printing blanket.

14

The abstract of the '541 patent explains that the invention includes "[a] seamless tubular printing layer over the inextensible layer [with] a continuous, gapless cylindrical printing surface."  The written description further provides that "the printing layer and the elastomeric bodies of the layers below the printing layer are continuous and seamless tubular bodies with no gaps or seams."  '541 patent, col. 7, ll. 48–51 (citations to the drawings omitted).  The written description also explains the manufacturing process:

> Next, a sheet of uncured print rubber 0.040 inches thick is wrapped over the outside of the of the incompressible layer to form the printing layer.  The resulting structure is wrapped with a 2.25 inch nylon tape, and is oven cured for four hours at 200° F. and four hours at 292° F.  The adjoining edges of the wrapped sheet are skived, and become bonded together when cured so that the finished printing layer has no axial extending seam. . . .  After curing, the tape is removed and the printing layer is ground to a thickness of about 0.013 to 0.020 inches, and is finished to define the smooth continuous outer printing surface.

'541 patent, col. 8, ll. 29–52 (citations to the drawings omitted).

Given the method of construction disclosed in the '541 patent, is clear that in the minds of the inventors, a continuous outer surface was not precluded by a manufacturing process that involves wrapping the outer printing layer around the inner

15

layers of a tubular printing blanket.  Thus, if by "continuous,"
MAN Roland refers to a quality that cannot result from a
manufacturing process that involves wrapping relatively outer
layers around relatively inner layers to form a printing blanket,
then the specification of the '541 patent would appear to
undermine MAN Roland's argument for a "continuous" limitation in
the relevant claims of the patents-in-suit.

Based upon the court's construction of the claim term "outer
printing layer" to include a "gapless" limitation on the outer
printing layer, but not a "seamless" or a "continuous" limitation
on the outer surface of the outer printing layer, the gapless
outer printing layer of the Reeves blanket is an "outer printing
layer" within the meaning of the patents-in-suit.

B. Intermediate Compressible Layer

The three patents-in-suit each claim an "intermediate
compressible layer."  The claims include no further qualification
of that claim term, and MAN Roland did not ask the court to
construe "intermediate compressible layer" in its claim
construction motion (document no. 142).  However, its sole
remaining defense to Goss's claim of literal infringement is its
argument that the intermediate compressible layers in the Reeves
and MacDermid blankets are not gapless and are not equally

compressible at all points circumferentially.  Of course, based

upon the court's previous claim construction order, the

intermediate compressible layers of the Reeves and MacDermid

blankets are gapless.  Thus, the question that remains is whether

the relevant claims of the patents-in-suit are properly construed

to include an "equal compressibility" limitation.

As with the proposed "continuous" limitation, the claims

themselves say nothing about equal compressibility.  But unlike

the "continuous" limitation, which is at least mildly supported

by the specification's frequent use of the term "continuous" as

an adjective to describe the outer surface of the outer printing

layer, the "equal compressibility" limitation is not supported by

the specification.  The concept of equal or uniform

compressibility is mentioned only once, in the following passage:

> Although it is preferred to form the compressible
> intermediate layer from a polymeric foam of uniform
> stiffness, the second layer could be formed with
> cylindrical inner and outer sections of void-containing
> foam having different stiffnesses.

'734 patent, col. 12, ll 13-17.  Of course, it is improper claim

construction to limit a claim to a preferred embodiment.  <u>See</u>

<u>Varco, L.P. v. Pason Sys. USA Corp.</u>, 436 F.3d 1368, 1375 (Fed.

Cir. 2006).  MAN Roland seizes upon the statement that the

intermediate compressible layer could be formed with two sub-

layers of different stiffnesses, and infers from that statement
that the claimed layer must have equal stiffness, and, therefore,
equal compressibility, at all points circumferentially.  An
inference from a statement about a preferred embodiment is not a
sufficient basis for reading into a claim a limitation that
appears nowhere else in the specification.  Moreover, as with the
proposed "continuous" limitation, the proposed "equal
compressibility" limitation is never contrasted with its logical
opposite – unequal compressibility – and identified as a reason
why the invention is an improvement over the prior art.

MAN Roland devotes most of its energy to arguing that while
prosecuting the patents–in–suit, the applicants created a public
record in which they defined the intermediate compressible layer
as having equal compressibility at all points around its
circumference.  The intrinsic record is not nearly as helpful as
MAN Roland believes it to be.

MAN Roland cites four amendments from the prosecution
history of the patents–in–suit in support of the proposition that
the applicants disavowed an intermediate compressible layer with
unequal compressibility such as that created by the filled space
of the Reeves blanket or the overlapping double–wrapped layer of
the MacDermid blanket.  MAN Roland reads too much into those

18

amendments, in part because it relies on a definition of "gap" that was rejected in the court's claim construction order and in part because it seems to recognize no difference between a printing blanket formed by wrapping relatively outer layers around relatively inner layers on a metal sleeve and a printing blanket that is installed on the press by wrapping them around a blanket cylinder.

The November 26, 1990, amendment explained that in the claimed invention, "the compressible layer <u>having no gaps</u> will yield equally at all points around the circumference of the blanket."  (MAN Roland's Obl. to Summ. J., Ex. 16 at 3 (emphasis added).)  The amendment then went on to distinguish the claimed invention from Shrimpton '541, which the applicants characterized as disclosing a conventional printing blanket mounted on a blanket cylinder by means of an axial opening.  (MAN Roland's Obj. to Summ. J., Ex. 16 at 3-4.)  Thus, the only unequal compressibility disavowed by the applicants was that created by a printing blanket gap, which is not present in the accused blankets.  The November 26, 1990, amendment is the strongest evidence MAN Roland cites for the disavowal of a compressible layer with unequal compressibility, and it is the only piece of prosecution history cited by MAN Roland that even mentions the concept of equal compressibility.

19

The November 17, 1992, amendment distinguished the claimed
invention from Gaworowski '386, which the applicants
characterized as disclosing a conventional printing blanket
mounted on a blanket cylinder by means of an axial opening, and
Ross '023, which the applicants characterized as disclosing a
spliced printing blanket.  (MAN Roland's Obj. to Summ. J., Ex. 12
at 7–8, 11–12.)  Thus, the only unequal compressibility disavowed
by the applicants was that created by a printing blanket gap or
splice, neither of which is present in the accused blankets.

The portions of the February 7, 1993, amendment cited by MAN
Roland state that "[t]he intermediate layer of material is a
layer of compressible material which is compressed by the plate
cylinder at the nip, the layer of compressible material having a
continuous tubular shape free of gaps," (MAN Roland's Obj. to
Summ. J., Ex. 8 at 3), and that "[t]he compressible intermediate
layer of the printing blanket of Applicants' invention enables
the printing blanket to have the same surface speed as the
printing plate on the plate cylinder at locations immediately
before the nip, at the nip and immediately after the nip" (MAN
Roland's Obj. to Summ. J., Ex. 8 at 15).  Those statements say
nothing about equal compressibility.  Moreover, neither of the
two prior art references discussed in the February 7, 1993,
amendment, Tittgemeyer '048 and Ross '009, discloses an

20

intermediate compressible layer in a printing blanket.  Thus, the
applicants' disagreement with the examiner's suggestion of
combining Tittgemeyer with Ross hardly counts as a disavowal of
intermediate compressible layers with unequal compressibility.

The January 17, 1995, amendment distinguished the claimed
invention from Brands '550 and Shrimpton '541, both of which the
applicants characterized as disclosing a conventional printing
blanket mounted on a blanket cylinder by means of an axial
opening.  (MAN Roland's Obj. to Summ. J., Ex. 15 at 8, 10 n.4.)
Thus, as with the November 26, 1990, amendment, the only unequal
compressibility disavowed by the applicants in the January 17,
1995, amendment was that created by a printing blanket gap, a
feature which is not present in the accused blankets.

While some of the prior art distinguished by the applicants
disclosed gapped or spliced printing blankets, none of that prior
art disclosed intermediate compressible layers with unequal
compressibility created by anything other than a gap or a splice.
Thus, the applicants never disclaimed unequal compressibility
caused by anything other than gaps or splices, and neither of the
accused printing blankets is gapped, like Brands '550, Gaworowski
'386, and Shrimpton '541, or spliced like Ross '023.
Accordingly, the prosecution history does not support imposition

of an "equal compressibility" limitation on the intermediate compressible layer claim.

Because the claims, the specification, and the prosecution history all fail to support MAN Roland's proposed construction of the intermediate compressible layer term to include an "equal compressibility" limitation, that term is not properly read into the relevant claims of the patents-in-suit.  Based upon the court's construction of the intermediate compressible layer claim term not to include an "equally compressible" limitation, the disputed compressible layers of the Reeves and MacDermid printing blankets are "intermediate compressible layers" within the meaning of the patents-in-suit.

## Conclusion

MAN Roland concedes that all but two limitations of the disputed claims are present in its Rotoman S press, outfitted with Reeves or MacDermid printing blankets.  Based upon the court's construction of the two disputed claim terms, "outer printing layer" and "intermediate compressible layer," those limitations are also present in the accused device, even with all inferences drawn in MAN Roland's favor.  See Mangosoft, 421 F. Supp. 2d at 396 (citation omitted).  Consequently, Goss is entitled to judgment as a matter of law that MAN Roland has

infringed claim 1 of the '100 patent, claim 1 of the '251 patent, and claim 1 of the '734 patent.

For the reasons given, Goss's motion for summary judgment (document no. 150) is granted, and MAN Roland's motion for summary judgment of non-infringement (document no. 176) is necessarily denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

July 31, 2006

cc:  Daniel E. Will, Esq.
     Hugh T. Lee, Esq.
     Richard S. Gresalfi, Esq.
     Georg C. Reitboeck, Esq.
     Mark A. Hannemann, Esq.
     Michael J. Lennon, Esq.
     T. Cy Walker, Esq.
     Jonathan M. Shirley, Esq.
     Alfred H. Hemingway, Jr., Esq.
     Irvin D. Gordon, Esq.
     Martin B. Pavane, Esq.
     Michael J. Songer, Esq.
     Shari R. Lahlou, Esq.
     Sidney R. Bresnick, Esq.
     Teodor J. Holmberg, Esq.
     Richard D. Margiano, Esq.
     John F. Sweeney, Esq.
     Steven F. Meyer, Esq.
     Tony V. Pezzano, Esq.
     Bruce W. Felmly, Esq.
     Seth J. Atlas, Esq.
     Anthony S. Augeri, Esq.